B. T. JOHNSON PUBLISHING COMPANY *v.* EDGAR P. MILLS.

1. TRUSTS AND COMBINES.  *Anti-trust act* 1900.  *Laws, p.* 125.  *School-books.  Public contracts.*

Although the bid on which a contract is based may be below the normal cost of production, the anti-trust law of 1900 has no application to the state or its public agencies in letting a contract for copyrighted schoolbooks in the manner provided by law, and as the result of competitive bidding, by the terms of which new books are for a time to be exchanged without cost, book for book, in the place of old books then in use, after which the prices agreed on are to be paid for all books furnished during the continuance of the contract.

2. PUBLIC WELFARE.  *Contracts.  Prices.  Constitution* 1890, *sec.* 198.

A public contract for an article below cost is not "inimical to the public welfare" within the constitution of 1890, sec. 198.

FROM the chancery court of Lee county.

HON. HENRY L. MULDROW, Chancellor.

Mills, the appellee, was complainant in the court below; the Johnson Publishing Company, appellant, was defendant there.

The opinion sufficiently states the case.

*Alexander & Alexander,* for appellant.

In execution of the injunction (of const. 1890, sec. 201) the legislature has provided a uniform system of free public schools, and, as it was permitted to do this "by all suitable means," it seemed proper to enact § 4068, code 1892, which provides for the adoption of a *uniform series* of text-books.  This statute provides that seven teachers of recognized ability in each county shall make the *selection* of the text-books to be taught in the county.  It was made the duty of the committee to communicate with leading publishers of school books, and obtain *sample copies* and price lists.  These price lists, if approved, were to be the

basis of a contract for five years. A *price list* was required, first, *for exchange;* second, for introduction, and, thirdly, for permanent supply. The committee was left open to select *all of the books* from one firm of publishers, or distribute them as they deemed proper. By § 4069 the *exchange and* introduction rates should continue for *one year only.* The reason for requiring these three separate price lists is obvious. It was known to everybody, and presumably to the legislature, that there is constant *progress and improvement* in the matter of text-books. As knowledge is widened, and literature improved, and discoveries made and inventions multiplied, a change in the text-books in every department of learning becomes desirable, if not indispensable. But this change might, if made, be attended with great hardships upon patrons of the schools, many of whom are poor and unable to discard the series of books already purchased. To gain for the citizen the *advantage* of the change and at the same time relieve him from the burden, the law makes the wise provision that the publishing firm which seeks to displace a text-book in use and secure the exclusive right for five years to furnish another, must offer *terms of exchange* and also make an *introductory price* for a term of one year; in this manner making the transition from one series to another to be attended with no hardship to the patron who had already bought books, and with as little expense as possible for introduction. Inasmuch as every pupil of every school in a county would have either to procure by purchase or *exchange* the new books, it was reasonable that publishers, in making an introductory price, should fix it at *wholesale rates.* As the contract made with appellants is an entirety, covering a period of *five* years, and embracing the period of one year for exchange and introduction and *four* years of regular or permanent supply, and as the first year embraces a period of *ninety days* for *even exchange,* it is impossible to know what importance was given by the respective parties to this feature of even exchange. It is impossible to *sever the consideration,* but it is to be presumed

that if such even exchanges should be at a *loss,* it would be compensated for, if not wholly *recouped,* in the price obtained for the rest of the five-year period. After these even exchanges were all made, and the *ninety days had ended,* this bill in equity was filed for the purpose of enjoining the performance of the rest of the contract. It is, we submit, a fair inference from this record that the bill was filed at the instance and for the real benefit of a *rival book concern.* Mills, the complainant, is beyond question a figurehead or dummy. Indeed, this is placed almost beyond question. He is a patron, and, as he alleges, has been compelled to make an even exchange of books, his injury being measured by the excess in value of his second-hand and probably worn out text-books over the new books of a higher grade, which he got in exchange for them!

The transaction cannot be brought even within the *letter* of the statute, and if its spirit be looked to, it is a result which the *statute sought to accomplish,* instead of one which it seeks to prevent. The exact language, which under the statute will convert a corporation into a trust or combine, is the doing of that "which shall destroy or attempt to destroy competition in the *manufacture or sale* of a *commodity* by offering the same for *sale* at a price below the normal cost of production." How was competition destroyed or attempted to be destroyed in this case? The state, through the county, its subdivision, was administering a *great public charity.* Acting under the constitutional mandate, it had provided public schools with *free tuition.* The system of schools must be uniform, and there could be no uniform system without *uniform text-books.* There could be no uniformity in the text-books in the various schools of the county except by procuring all books of the same kind from the *same publishing house.* It is a matter of common knowledge that all books of any value are *copyrighted.* The federal constitution provides for this. In no other way can the rewards of intellectual labor be secured. It necessarily follows *after the adoption of a particular text-book* there can never be any competi-

tion between publishing houses in *its* sale. The *exclusive right* to sell is the consideration of the *contract* on the part of the publishers.

We notice a sharp and singular paradox in complainant's position. He complains in one breath that appellants are *selling too low,* and in the next that they are *selling too high;* that for a period of *ninety* days the exchange price, namely the value of the superseded books, was *below* the cost of production; and that the introductory and permanent prices are far *above* a reasonable profit over the cost of production. His averments and arguments are self-destructive; the *contract is an entirety.* Both parties had the right to consider the question of a reasonable profit *for an entire term of five years.* The contract cannot be condemned because of the fact, if such it be, that for a short term, and as to a portion of the books, appellant made no profit. The inherent vice of monopolies is that they *destroy competition.* The public are interested in competition because it *lessens prices;* the sharper the competition, the lower the prices. Now this statute has regard, not to the *welfare of the publishing houses,* for they are presumed to be able to take care of themselves, but to the welfare of the *public,* and especially the *patrons of schools.* The state at an enormous cost, by way of taxation, establishes and maintains schools. It provides uniform text-books, and requires the pupils, who avail of the state's bounty, *shall use the books adopted,* knowing that there can be *no competition in copyrighted works,* as between competing houses, the legislature arranges to get the benefit of this competition between publishers controlling *different copyrights.* In doing so, it resorts to a method adopted in all legitimate commerce. The law publisher who has gotten out a new and valuable work, sends hundreds of copies to distinguished attorneys or judges *free of charge.* It is the law of trade, and it is right. The work is thus examined, and, if approved, is introduced, and the seller and the buyer are both beneficiaries. So we repeat, that the transaction which resulted in a *free exchange* is the,

result of a healthful competition, which is the end and purpose of the statute, instead of the thing forbidden.

It was not in the *power* of B. F. Johnson & Co. to do anything to destroy competition in this case. The law afforded the widest opportunity for all publishers to compete with their books. There is no complaint that a single schoolbook house in the United States did not enter into the competition. They all submitted *bids*. They all submitted a *permanent price,* an *introductory price,* and an *exchange price,* for their respective books. It is a moral certainty that the exchange price in every offer was lower than the cost of production. The legislature expected it to be so, and for that purpose *limited the period* of such prices. It is a moral certainty that the exchange price in every offer was *above the cost of production,* what would the *permanent price* be? It is manifest from the whole bill that it is looking at the transaction from the standpoint of the interest of a rival book concern, whereas sec. 11 of the act of 1900 provides that the act shall be liberally construed to the end that "the *benefits* arising from *competition* in business shall be preserved *to the people* of this state." The evil sought to be remedied was the too common practice of a wealthy trading corporation crushing out a worthy rival by selling for a time below cost of production, *with the expectation of ultimately raising prices, freed from competition.* No such evil can be feared in the matter of sales of text-books. Appellants did not leave themselves free after the ninety days to raise the prices. The prices were fixed for a term of *five years,* and even then another sharp competition would have to be met. The reasoning that would condemn this contract and seek to bring this transaction within the statute would make illegal many of the common transactions in business. What would be thought of a bill by a citizen to cancel the contract between the *state and the contractors for our new capitol* on the allegation that they had won the contract on a bid too low, and which would bring loss to the contractors?

Suppose when merchants are invited to submit competing bids for supplying one of the charitable institutions of the state with clothing or other goods, some man should see fit *to donate* all that was needed, would it be a crime? The competition at which the *constitution* is aimed, is *not the fair and open-to-all* competition of *public bids,* but the continued and oppressive competition in the course of *private business.* There are certain public services which in their very nature are monopolies, and the supplying of any of our copyrighted text-books for public schools is one of them. The right of state and counties to adopt uniform text-books for schools, and to contract for them, has been upheld in every case in the United States where the question has been before the courts. The whole question here presented has been so thoroughly and exhaustively considered, both in the light of reason and authorities, that it would be an affectation of learning to submit any reasoning of our own. We refer the court to *State* v. *Haworth* (an Ind. case), in 7 L. R. A., 240, and the case of *Leeper* v. *State* (a more recent Tenn. case), in 48 L. R. A., 166. All of the authorities touching the law of *monopolies,* as sought to be applied to public school systems and uniform text-books, are cited in these two cases.

The basic principle of a monopoly is its tendency to prejudice the public or oppress individuals. See note to *People* v. *North River Refining Co.,* 2 L. R. A., 33. Suppose the state should seek to furnish the children of the state *free text-books,* as it does free schoolhouses and free tuition, would the state be held guilty of violating the spirit of our fundamental law against monopolies, merely because certain publishing houses might be prejudiced? If the state could legally, in the administration of this great charity, furnish free text-books, wherein would it be unlawful for it to furnish them free or below cost, through a publishing house? The answer to all of this is that in the furnishing of books to patrons at the instance of the county, and through a contract with the county, the publishers are ren-

dering a *public service* and not engaging solely in *private trade.* *Exclusive* contracts for *public service* are uniformly upheld, as for instance, the contract for removing garbage from cities. These contracts have been attacked in many cases and are always upheld. *Smiley* v. *McDonald,* 27 L. R. A., 540.

Act 1900 has no application to contracts *by or on behalf of the state.* The state is never embraced in a statute prescribing duties or imposing liabilities unless expressly mentioned. See Sutherland Stat. Con., sec. 161; *Josslyn* v. *Stone,* 6 C., 753; *Joiner* v. *State,* 1 C., 500; *Dollman* v. *Moore,* 70 M., 267. It is for the reason that grants by the state, counties or municipalities of public monopolies for a reasonable time are upheld. 16 L. R. A., 485; 8 Ib., 539; *State* v. *Aiken* (S. C.), 26 Ib., 34 (state dispensary law). If the right of the state to a monopoly in supplying its men with intoxicating liquor, that tends to destroy body and soul, is upheld, we should blush with shame if told that the state cannot, through publishers (having by law the copyright), furnish to the children of the state, and at the lowest obtainable prices, text-books to educate and uplift them mentally and morally, and develop in them the highest type of citizenship.

The contract between appellant *and the state* cannot be brought either within the letter or spirit of sec. 2 of the *act of 1900.* The "contract, or agreement," referred to in sec. 3, and which are made void, are the contracts specifically defined in sec. 1 "as having been made *between two or more persons,* corporations or firm, or association of persons," etc. It can have no reference to *public contracts* made by or in behalf of the state where competitive bids are required, and where the law requires the contract to be made with the *lowest responsible bidder.*

*J. M. Thomas,* on same side.

Because the bill charges "craftily intending, willfully and unlawfully," etc., to destroy competition, does not settle the question of law as to whether or not competition is destroyed when

the facts set up which show the willfulness and unlawfulness, is evidenced by the contract between the publishing company and the adopting board. That contract is the evidence of the willfulness itself. The test is the effect such contract would have on the public, and whether the public would be deprived of any benefits arising from competition. Here we have a bill showing where all concerned entered into competition for this five years' contract, and the appellant was the successful one as to a part of the business. Strong competition exists here, in fact, and as strong competition can be contemplated after the five years' contract is up. All of the elements of competition is clearly shown in these circumstances. A man may use his property in any way for his own pleasure, unless he does it to the injury of some one else or to the public. By competition the appellant got this contract. Nobody else was injured by it. The public was not, but on the contrary, benefited, and where can the appellants be charged with the criminal act by giving away their property when it injures no one else? It must be understood that this bill does not charge a criminal conspiracy or an illegal combination of capital, nor in fact, as agreed by counsel, does not charge a monopoly except in so far that selling below the cost of production goes towards gaining a monopoly. If the monopoly is legal, the essential part and feature of the statute is destroyed, and a violation of the methods is inapplicable. A horseshoer might, by the use of deceit or fraud, exact a great amount of money for shoeing a horse in the method of doubling up, putting in the first nail for one cent and doubling thirty-two times, but there is no fraud alleged in this bill, and, further, there is a full line of competition in the shoeing of this horse and entered into by parties who are selected by the legislature because they are specially fitted to do so, and who may, in the interest of the public, look into the crafty intent and unlawful designs of public concerns who make them propositions. Could the concern which took the contract several years ago in this state for printing public journals be indicted for being a

trust and combine because it took the job too cheap? Suppose the board of public contract, or rather trustees of the insane asylum, should advertise for bids for flour to be used in that institution for five years. One concern offers to give them their flour for one year, and for the next four years sell it at $4.00 per barrel. Another concern offers to sell for the full five years at $3.25 per barrel. Which is the best contract? Could the first concern be convicted of being a trust and combine because they sold the flour for the first year below the cost of production? And, suppose this first concern should see that they were losing money on it. If this case is well founded they could then secure any citizen of the state of Mississippi to bring a bill against 'them in equity and get their own contract voided—certainly a very dangerous precedent to establish in this state. Even should this court find the parties properly interested made parties to this suit, and that court of equity has full jurisdiction, and that the bill alleges the fact which would institute a violation of the anti-trust act, still the relief sought. to wit, the cancellation of the contract, is not founded on good law.

Section 4, ch. 88, laws of 1900, does not refer to contracts made unless they are relative to the trust agreement or illegal combination of the trust or combine. It does not refer to contracts of this kind. The contract cannot be canceled because it is in restraint of trade, and therefore void for the reasons above stated, and as announced in the Lorillard case. 110 N. Y., 522.

*Green & Green,* for appellee.

Any corporation "which shall destroy or attempt to destroy competition in the manufacture or sale of a commodity, by offering the same for sale at a price below the normal cost of production, shall be deemed and held a trust within the meaning of this act." So the law is written, and it must be enforced. This constituted a limitation upon the powers of a corporation to contract because such contracts were inimical to public policy.

The position that contracts made under code, §§ 4068 and 4069, are not within the act, is unsound. Section 2 of the acts 1900 has no such limitation. There is no distinction made between public and private acts. All such contracts are declared void. There is no reason why this act should apply to private contracts and not to public. Self-protection dominates the individual, the protection of other only in the public ones.

Under this act it is contrary to public policy to sell below the normal cost of production, and when the state enters the domain of business, it does so as a private corporation and not as a sovereign, and is bound by like limitations. *Hall* v. *Wisconsin,* 103 U. S., 11. This is not a contract with the state, and it is not a contract of sale even to the county. This is not a public contract, for it does not fulfill the statutory requirements in that regard. The school committee are not public officers—they are only a committee of teachers. They may be— and usually are—women. There is no public advertisement, only a communication with the leading ( ?) firms. A mere private quotation is required; these are gone over in private, and this is an "adoption." This is substantially the same as done by merchants every day.

Under § 4069, the county superintendent is to enter into a written contract prescribed by the board of education for a supply of these books at the rate specified, and the statute forbids the use of any other books. The county is in no way bound —the contract is only on behalf of the patrons. The contract only binds the publisher to supply the adopted books at the prices named to the patrons. It is purely a contract on behalf of the patrons. The county has no interest in it.

As said in *Effingham* v. *Hamilton,* 68 Miss., 523, "the object of the law providing for the selection of a uniform series of text-books for the public schools, and of all of its provisions, was for the benefit and protection of the people, and not for book publishers," etc. The legal duty is on the publisher to supply the patron with books. An action at law, under the

well settled rule, could be brought on the contract, in the name of the county superintendent for the use of the patron for a breach thereof by the publisher, and in his own name in equity. 7 Am. & Eng. Ency. Law (2d ed.), 106, 107, 108; *Sutton* v. *Bd. of Police*, 41 Miss., 236; *Lee* v. *Newman*, 55 Miss., 365; *Johns* v. *Wilson*, 180 U. S. (1901), 440. Hence, while in form the contract was with the county superintendent, in substance it was with every patron of the school.

Argued orally by *J. M. Thomas* and *C. H. Alexander*, for appellants, and by *M. Green*, for appellee.

CALHOON, J., delivered the opinion of the court.

Mr. Mills, averring himself to be a citizen and resident of Lee county, with children attending the public schools, charges in his bill that appellant is a corporation, nonresident, and the owner of the copyrights of certain schoolbooks; that its charter is duly filed in the office of the secretary of state, with all fees paid, and with the consequent authority to exercise its franchises and sell its books in Mississippi; that the proper statutory schoolbook adopting agency of the state, proceeding in all respects according to law, selected certain of appellant's copyrighted schoolbooks, among divers bids from divers publishing houses to furnish books on the same branches of education, on divers terms of selling prices, for exchange, introduction, and permanent supply, as by law provided; that appellant offered to "sell, by way of exchange," its books, new for old books, then in use of like grade and subject, by any author, on even terms, regardless of their condition as to wear, etc.; that accordingly its books were adopted, and a contract was concluded between appellant and the county superintendent of public education for "exchange, introduction, and permanent supply." This contract, exhibited with the bill, has this clause: "Provided, however, for the next 90 days from date, or until January 1, 1901, an even exchange is granted on all above-named books, book for

book. After January 1, 1901, the regular exchange prices as above are to be in effect." The regular exchange prices had been before specified. Outside this proviso, the exchange and introduction prices were to remain in force for only one year from the date of the contract, when prices agreed upon were to take effect and control for the remaining four years of the life of the contract. The bill further charges that the school patrons owned other books, and were thus compelled to exchange old books for new ones, of more value mechanically; that appellant was thus selling these schoolbooks, which are termed a "commodity," at a price "below the normal cost of production;" that the design of this was to destroy competition, and thus to effect a monopoly, etc. The prayer is that appellant be declared "an unlawful trust and combine," the contract declared void and canceled, for injunction restraining appellant from further selling, and the school patrons from further buying, and for general relief. An amended bill shows that the district-attorney and the attorney-general were applied to, before the original bill was filed, for the use of the name of the state, with appellee as relator, to have appellant "declared a trust and combine, and forfeiture of its right to do business in this state, and a cancellation of its contracts," but that both of these officers declined, though the attorney-general would have allowed it, provided, "if any book concern was behind the suit, causing it to be brought, such book concern should be the relator." But the bill says, "Complainant's attorneys did not care to divulge who, besides complainant, were interested in this matter," and so Mr. Mills proceeds alone. A demurrer to the amended bill was overruled, and the B. F. Johnson Publishing Company appeals.

We do not consider now, nor decide, whether, under § 3520, code 1892, and ch. 88, acts 1900, the remedy by *quo warranto* is exclusive; nor whether a patron of a school may proceed alone in equity; nor whether, if he had any remedy affecting such large public interests, he should or should not have proceeded by mandamus; nor whether the state, or the

Lee county schoolbook adopting board, or the superintendent of education of that county, or all three, were necessary parties to the suit brought; nor whether competitive bids pursuant to advertisement, for any purpose, fall within the purview of our anti-trust statutes; nor whether copyright schoolbooks are "commodities," within those statutes. We do not decide any of these questions, because we are not required to decide them in order to dispose of this case, and "sufficient unto the day is the evil thereof." We do decide that our anti-trust laws do not apply to the state, or any of its statutory agencies, in making such contracts as the one exhibited here, although their bids may be below the normal cost of production; and it cannot be said that a public contract for an article below cost is "inimical to the public welfare," under sec. 198 of the constitution. The authors of books copyrighted already enjoy a monopoly which neither legislatures nor state conventions can interfere with, and we see no reason to prevent them from introducing their works, by way of contract with the state or its public agencies, on the terms set out in this contract. It is all in fair competition with other holders of patent-right books. It would seem they might give them to a state, if they wished. After all, it is hardly the price of a book, but its educational value, which should control boards of adoption.

*Reversed and bill dismissed.*